**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| VILLAGE OF WALTON HILLS, *ex rel, et al.*, | ) ) ) | CASE NO. 1:20-cv-01772 |
| Plaintiffs, | ) ) | |
| | ) | JUDGE DAVID A. RUIZ |
| v. | ) ) | |
| VILLAGE OF WALTON HILLS, *et al.*, | ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | ) ) ) | |

### I. Procedural History

On March 15, 2019, Plaintiff HGE Concrete Supply Company LLC ("Plaintiff"), on behalf of itself and as a taxpayer on behalf of the Village of Walton Hills, filed a ten-count Amended Complaint raising the following claims against Defendants Village of Walton Hills, the Planning Commission of Walton Hills, Building and Zoning Inspector Robert Kalman, and Mayor Donald Kolograf (collectively "Defendants"): (1) Denial of Equal Protection of the Law; (2) Inverse Condemnation; (3) Denial of Procedural and/or Substantive Due Process; (4) Deprivation of Civil Rights under 42 U.S.C. § 1983; (5) Gross Negligence; (6) Injunctive Relief pursuant to O.R.C. § 733.56; (7) Declaratory Relief; (8) Conspiracy; (9) Mandamus action pursuant to O.R.C. § 733.58; and (10) Fraudulent Inducement.[1] (R. 24). On March 29, 2021, Defendants

---

1 Plaintiff does not specify which particular contracts that it was fraudulently induced into entering with Defendants. Rather, Plaintiff alleges it was fraudulently induced into "doing business within the Village." (R. 24, PageID# 168-169).

filed their Answer to the Amended Complaint and Counterclaims for Breach of Contract (specifically the December 28, 2018 Development Agreement); Unjust Enrichment; and Injunctive Relief to prevent alleged dumping and pollution by Plaintiff. (R. 26). Now pending is Defendants' motion for summary judgment on Plaintiff's claims (R. 34), which Plaintiff has opposed. (R. 41). Defendants also filed a reply in support. (R. 44).

## II. Summary of Key Facts

### A. Purchase of a Parcel by Plaintiff in the Village of Walton Hills[2]

This lawsuit revolves around Plaintiff's purchase and use of a property at 710 W. Krick Road located in Walton Hills, Ohio. (R. 24, PageID# 154, 156). Plaintiff is "a ready mix concrete supplier, and has its headquarters and principal place of business" at the aforementioned address. *Id*.

Around March 7, 2018, Plaintiff's managing member, Jeramy Ennis, became interested in the W. Krick Road parcel (hereafter "the Property"); then Mayor Kevin Hurst informed Ennis the Property was owned by the City of Bedford—not the Village of Walton Hills. (R. 36, Ennis Depo. at 9, 34-35; 36-38). According to Ennis, Mayor Hurst represented that he could streamline the zoning process and have building permits ready within ninety (90) days. *Id*. at 45-46.

On June 12, 2018, after meetings with Mayor Hurst and Village Engineer Sheehy, Plaintiff purchased the Property for $600,000 from the City of Bedford. (R. 36, Ennis Depo. at 42). Before purchasing the Property, Ennis had no understanding that it was zoned as Light Industrial-1 ("I-1"). (R. 36, Ennis Depo. at 45). Unlike Heavy Industrial ("I-2") zoning, I-1 zoning prohibits rock crushing and outside storage of materials. (R. 34-5, PageID# 379, Exh. D,

---

[2] The Court's recitation of the facts is not intended to be exhaustive.

Aff. of Robert Kalman, Building-Zoning Inspector for the Village of Walton Hills; R. 44-2, PageID# 1128, Kalman Aff., Exh. B; R. 44-3, PageID# 1182-1183, Declaration of Mark Majewski, Exh. C).

Ennis claims he did not learn the Property was zoned I-1 until *after* the Property was purchased when he retained Mark A. Henning as an architectural consultant in August of 2018.[3] (R. 36, Ennis Depo. at 55-56). The Village of Walton Hills claims it has an easement allowing it to use an undedicated gravel road ("gravel road"), which leads to the Property. (R. 34-5, Aff. of Kalman; R. 37).

**B. Development of the Property**

Before Henning's retention as an owner representative in early to mid-August of 2018, Plaintiff's architects had submitted preliminary plans but had not yet submitted "a full set of documents for … complete planning approval," and Plaintiff had not yet retained a civil engineer to handle stormwater management and topography issues. (R. 37, Henning Depo. at 31-33). Henning concedes that prior to his retention, Plaintiff had not submitted a set of plans that met Walton Hills' requirements, as they were lacking basic calculations regarding stormwater management. *Id*. at 31 ("They never even got to that point, again, in their initial meetings with the village.")

On August 28, 2018, Plaintiff submitted a set of plans to Walton Hills that included space for a cul-de-sac that the village wanted. *Id*. at 50-53. Plaintiff's engineer agreed that "Walton

---

[3] Defendant's expert opined that I-1 zoning was appropriate, as "[r]ezoning of this property to I-2 would create an area in which I-2 zoning would be the closest location to a residential district of the Village." (R. 44-2, PageID# 1184). He further indicated that: "[t]o my knowledge no application was submitted to the Village for zoning map amendment which meets the requirements of Chapter 1256 for making such request." *Id*.

Hills and HGE had come to an agreement about not putting in the dedicated roadway and cul-de-sac now," but would include the roadway and cul-de-sac in the paper plans and readdress the issue in the future. *Id*. at 55.

During a September 10, 2018 meeting that Plaintiff attended with counsel, Walton Hills' law director Bill Mason suggested a Development Agreement, which Plaintiff was "not opposed to." (R. 36, Ennis Depo. at 78; R. 37, Henning Depo. at 58). Ennis testified that: "[w]e agreed at that meeting we would indicate it on the drawing and give them the room for future development of the cul-de-sac, but it was not a requirement to move forward any longer." (R. 36, Ennis Depo. at 78). According to an October 1, 2018 letter from Henning, Plaintiff's owner representative, Plaintiff's attorney would shortly submit a Development Agreement for negotiation between Plaintiff and Walton Hills. (R. 37, Henning Depo. at 63, Exh. B). Plaintiff's counsel and the Village went back and forth over the details of the Development Agreement, with multiple drafts exchanged between legal counsel for Plaintiff and the Village. (R. 36, Ennis Depo. at 80-81).

According to Henning, plans submitted on October 2, 2018, were for planning approval despite markings stating "preliminary" or "not for construction." (R. 37, Henning Depo. at 64, 67). Defendant Robert Kalman, Walton Hills' Building-Zoning Inspector, stated in his affidavit that "the October 2, 2018 plans still required additions regarding riparian setbacks before they could be submitted to … [the] Planning Commission for review and approval. (R. 34-5, PageID# 380, Kalman Aff. at ¶11).

According to Kalman, on December 3, 2018, Plaintiff submitted its first set of final plans for review and approval by the Planning Commission. (R. 34-5, PageID# 380, Kalman Aff. at ¶12).

On December 18, 2018, Walton Hills' Planning Commission unanimously voted to approve

the plans. (R. 34-5, PageID# 380, Kalman Aff. at ¶13). Plaintiff received a building permit ten days later. (R. 36, Ennis Depo. at 96).

On December 28, 2018, all parties signed the Development Agreement for the Property. (R. 37, PageID# 908-916; Exh. E). The agreement prohibits "[c]oncrete recycling, processing, crushing, handling or other activities involved in creating recycled or virgin stone aggregate materials," limits Saturday operations to 6:30 a.m. until 12:00 p.m., prohibits any operations on Sunday, and prohibits "[d]umping of any kind." *Id*. at PageID# 909. The agreement obligated Plaintiff to commence the construction of the plant after it had obtained all necessary permits. *Id*.

Plaintiff began construction prior to recording all easements in February and March of 2019, and Plaintiff was "able to put the footer in to our building, erect our building and start putting the footer and the slabs for our concrete plant." (R. 36, Ennis Depo. at 90-91).

On June 22, 2019, Plaintiff began operating its concrete plant at the Property. (R. 36, Ennis Depo. at 27). In his affidavit, Defendant Kalman asserts that Plaintiff began violating laws and breaching the Development Agreement soon after commencing operation, stating that he personally observed Plaintiff "dumping material and concrete refuse" outside of areas where it is permitted to operate. (R. 34-5, PageID# 380, Kalman Aff. at ¶¶16-21).

In August of 2019, Plaintiff submitted plans to add a silo and an enclosure around its concrete plant. (R. 36, Ennis Depo. at 111).

On August 23, 2019, the Village of Walton Hills' law director wrote a letter to Ennis indicating that before proceeding on the building of another structure, the Village of Walton Hills wanted to resolve several issues including the following violations of the Development Agreement: prohibited operation on Sundays; on-site dumping; operation without a Certificate of Occupancy; incomplete plumbing, electrical, HVAC, and final building inspections; lack of a

5

fire inspection; and several others. (R. 36, PageID# 678, Exh. H).

On November 22, 2019, Defendant Walton Hills, through counsel, sent a letter to Plaintiff complaining of Plaintiff's breaches of Village ordinances and the Development Agreement. (R. 36, PageID# 681-683, Exh. J). Among numerous violations, Defendant Walton Hills asserted Plaintiff was violating O.R.C. § 6111.04(A)(1) by "[p]lacing sewage, sludge, sludge materials, industrial waste, or other wastes where they could cause pollution to waters of the state." *Id*.

On April 20, 2020, Henning, Plaintiff's owner representative, wrote a letter to Mayor Kolograf requesting the Property be rezoned from I-1 to I-2. (R. 37, Henning Depo. PageID# 924; Exh. G).

On May 15, 2020, Henning submitted plans from Polaris Engineering and Surveying that addressed outstanding issues concerning a retention pond. (R. 37, PageID# 928-29; Exh. I).

On June 18, 2020, Plaintiff was issued a Certificate of Occupancy for the Property. (R. 36, PageID# 690, Exh. P). According to Henning, Plaintiff had previously received a "preliminary occupancy permit … that lasted for quite some time." (R. 37, Henning Depo. at 75-76).

On May 11, 2021, the Ohio Environmental Protection Agency (EPA) inspected Plaintiff's concrete facility at the Property and found several violations, issuing Notice of Violations (NOV) to Plaintiff on May 11, 2022 and October 21, 2022. (R. 44-5, PageID# 1213-1237). These included concrete washout water entering the storm water retention basin via the storm sewer. *Id*.

Plaintiff has never been monetarily fined by Walton Hills. (R. 36, Ennis Depo. at 141). The only stop work order Plaintiff received was on September 7, 2018, before receiving planning approval. *Id*. at 140.

## C. Disputed Evidence

Plaintiff submitted an affidavit from its managing member, Ennis, as well as from its

architect Henning. (R. 41-1 & 41-2). Ennis's affidavit attached an "Exhibit A-1," which ostensibly contains a transcript from a Walton Hills' "Whole Council Meeting" on October 1, 2019. (R. 41-1, PageID# 971, ¶3). Ennis asserts that he accessed the audio transcript of the meeting from Walton Hills' website, "listened to, and had transcribed, a copy" of the meeting which is found in Exhibit A-1. *Id.*

Defendants' reply brief objects to the appropriateness of these affidavits and Ennis's transcription of the October 1, 2019 meeting. (R. 44, PageID# 1047). Defendants assert that the transcript has not been properly authenticated as accurate as attested to by a certified court reporter; that the affidavits contain "purely conclusory statements that are not supported by any facts or personal knowledge;" that Ennis's affidavit contains inadmissible hearsay; and, that numerous statements in both affidavits contradict Ennis and Henning's sworn deposition testimony. *Id.*

Pursuant to Fed. R. Civ. P. 56(c)(4), an affidavit or declaration used to support or oppose a summary judgment motion must be made on personal knowledge, and set out facts that would be admissible in evidence. Ennis does not have personal knowledge of the October 1, 2019 meeting, but rather purports to have transcribed an online audio version of the meeting. There is simply no reason Plaintiff could not have obtained this information in the course of discovery from Defendants, rather than relying on Plaintiff's own, unauthenticated transcription.[4] Ennis has no personal knowledge of the facts contained within the documents he purports to authenticate. *See, e.g., Bell v. City of Topeka, Kansas*, 496 F. Supp. 2d 1182, 1185 (D. Kan. 2007) (finding the

---

[4] Plaintiff claims that Defendants omitted minutes from this meeting in its response to Plaintiff's request for documents. (R. 41, PageID# 942). The docket, however, does not indicate that any discovery dispute was ever brought to the Court's attention.

affidavit submitted by plaintiff's counsel was "insufficient to provide authentication when plaintiff's counsel is not the author of these documents nor does he state that he has any personal knowledge of the facts contained within those documents."), *aff'd sub nom. Bell v. City of Topeka, KS*, 279 Fed. App'x 689 (10th Cir. 2008); *Steele v. Jennings*, 2005 WL 2124152, at *3 (S.D. Ohio Aug. 31, 2005) ("The failure to authenticate a document properly precludes its consideration on a motion for summary judgment.") (citations omitted); *accord Kelley v. Robey*, 2022 WL 662316, at *5 (W.D. Ky. Mar. 4, 2022) ("Unauthenticated exhibits are not proper evidence for opposing or supporting a summary judgment motion.") Therefore, Ennis's personal transcription of the recording may not be considered.

Other statements in the affidavits—such as statements concerning Walton Hills' interactions with other business—lack any foundation indicating Ennis or Henning have personal knowledge. Affidavits offered in opposition to summary judgment, as stated above, must be based on personal knowledge and must be admissible as evidence; and, in addition, must show affirmatively "that the affiant … is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(c)(4). "[E]vidence submitted in opposition to a motion for summary judgment must be admissible. Hearsay evidence ... must be disregarded." *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (*quoting U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir. 1997)). Even if Ennis's statements come from conversations with other business owners or village officials, the Sixth Circuit has found that an affiant's statements "apparently based solely upon information that he received from elsewhere … is … inadmissible hearsay," as it does not demonstrate personal knowledge. *Alpert*, 481 F.3d at 409; *see also Hurick v. McKee*, No. 17-1396, 2018 WL 4908138, at *3 (6th Cir. Apr. 30, 2018) (finding that the Sixth Circuit has "long held that unauthenticated documents do not meet the supporting-documentation

requirements of Rule 56…. Inadmissible hearsay evidence also does not suffice.") (internal citations omitted); *Jamison v. Angelo*, No. 4:10CV2843, 2012 WL 4434152, at *9 (N.D. Ohio Sept. 24, 2012) (statements made "on information and belief" are insufficient to satisfy the personal knowledge requirement of Rule 56).

The Court also agrees that the affidavits cannot be considered to the extent they contradict Ennis and Henning's own sworn depositions. *Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 459 (6ᵗʰ Cir. 1986) ("A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony."). Also known as the "sham affidavit rule," it can even apply without a direct contradiction "when the witness's affidavit is in tension with that prior testimony as long as the circumstances show that the party filed the affidavit merely to manufacture 'a sham fact issue.'" *Boykin v. Fam. Dollar Stores of Michigan, LLC*, 3 F.4th 832, 842 (6ᵗʰ Cir. 2021). As the above cited testimony establishes, many of the initial delays were caused by Plaintiff not submitting final plans capable of approval, and the affidavits' suggestions that the Development Agreement caused the delays contradicts both Henning and Ennis' testimony.

Finally, as explained *infra*, the information contained in the affidavits and transcript, even if considered, do not demonstrate that the Defendants' action was motivated by animus or ill-will, and certainly fails to show that any of the Defendants' acts or omissions were made with malicious purpose, in bad faith, or in a wanton or reckless manner.

### III. Summary Judgment Standard

Summary judgment is appropriate only if the moving party demonstrates there is no genuine dispute of material fact on an issue that would entitle the movant to judgment as a matter of law. Fed.R.Civ.P. 56(a). All evidence must be viewed in the light most favorable to the

nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6ᵗʰ Cir. 2008), and all reasonable inferences are drawn in the non-movant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is only genuine, however, if a reasonable jury could resolve the dispute and return a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6ᵗʰ Cir. 2013).

### IV. Law and Analysis

**A. Count One: Equal Protection Claims**

In Count One of the Amended Complaint, Plaintiff alleges a denial of Equal Protection, and asserts "the Property has been arbitrarily, wrongfully, unlawfully and/or unreasonably limited in use and development." (R. 24, PageID# 159). Defendants assert this count should be dismissed because the equal protection claim does not involve a suspect class and must be evaluated under a "class-of-one" theory. (R. 34-1, PageID# 237).

The Sixth Circuit Court of Appeals considered a factually similar case, *Ziss Bros. Const. Co., Inc. v. City of Indep.*, 439 Fed. App'x 467, 475 (6ᵗʰ Cir. 2011), when a property developer whose preliminary plan was rejected by a zoning commission after the developer had already purchased the property alleged violations of 42 U.S.C. § 1983, substantive and procedural due process, and equal protection. The Sixth Circuit explained:

> The equal protection clause of the Fourteenth Amendment prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "[T]his language embodies the general rule that States must treat like cases alike but may treat unlike cases accordingly." *Club Italia*, 470 F.3d at 298 (internal quotations omitted). The Supreme Court has stressed that "the purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against

intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000).

To prevail on an equal protection claim "a plaintiff must adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'" *Ctr. For Bio–Ethical Reform*, 648 F.3d at 379 (quoting *Club Italia*, 470 F.3d at 299). Moreover, "[w]hen a plaintiff does not allege that the government's actions burden a fundamental right or target a suspect class, the plaintiff is said to proceed on a so-called class of one theory and must prove that the government's actions lacked any rational basis." *Club Italia*, 470 F.3d at 298; *see also Olech*, 528 U.S. at 564, 120 S.Ct. 1073. "Where ... no suspect class or fundamental right is implicated, governmental action subject to equal protection scrutiny under the rational basis test must be sustained if any conceivable basis rationally supports it." *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cnty., Ohio*, 430 F.3d 783, 790 (6th Cir. 2005) (internal emphasis omitted).

*Ziss Bros. Const. Co., Inc. v. City of Indep.*, 439 Fed. App'x 467, 475 (6th Cir. 2011); *see also*

*FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313-14 (1993).

Here, the Amended Complaint claim does not allege the involvement of a suspect class such as a racial or ethnic minority, nor does it allege the denial of a fundamental right. In fact, Plaintiff's opposition brief tacitly concedes it must proceed under the class-of-one theory, as its arguments revolve exclusively around that theory. (R. 41, PageID# 945-52).

The Supreme Court has recognized "successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that [1] she has been intentionally treated differently from others similarly situated and [2] that there is no rational basis for the difference in treatment." *Johnson v. Morales*, 946 F.3d 911, 939 (6th Cir. 2020) (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (*per curiam*)). In order to satisfy the first element, a plaintiff is required to show that "others who were treated differently were 'similarly situated in all relevant respects.'" *Johnson*, 946 F.3d at 939 (*citing EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 865 (6th

Cir. 2012)). In order to satisfy the second element, a class-of-one plaintiff "may demonstrate that a government action lacks a rational basis in one of two ways: either by negativ[ing] every conceivable basis which might support the government action *or* by demonstrating that the challenged government action was motivated by animus or ill-will." *Johnson*, 946 F.3d at 939 (emphasis added) (citing *Warren v. City of Athens*, 411 F.3d 697, 711 (6ᵗʰ Cir. 2005)).[5]

Plaintiff's brief in opposition identifies two of Plaintiff's competitors in the concrete business as similarly situated entities who are not subject to the same restrictions as Plaintiff—Ioppolo Concrete Corporation and Carr Bros. (R. 41, PageID# 947). In the affidavit of Building/Zoning Inspector Kalman, it is stated that the "Ioppolo concrete plant is located in the City of Bedford, not Walton Hills, and is not subject to Walton Hills zoning or ordinances." (R. 44-5 at ¶ , Exh. E at ¶9).[6]  The affidavit does acknowledge that Ioppolo owns a parcel of property in Walton Hills that "is used solely to stockpile material; is zoned I-2; is not adjacent to any residential properties; and has been operating as such for an extended period of time as to

---

[5] The Court finds, as explained below, that Plaintiff has not demonstrated a genuine issue of material fact with respect to the first element, rendering the second element moot. Moreover, "[u]nder rational basis review ... the burden falls entirely to Plaintiff to show there is no rational basis," and "Defendant[s] need not offer any rational basis so long as this Court can conceive of one," *Ziss Bros.*, 439 Fed. App'x at 476 (citations omitted). Defendants in this case point to several facts in the record that provide a rational basis for their insistence that Plaintiff comply with applicable regulations — protection of the environment and to protect neighboring residents from industrial nuisances. (R. 34-1, PageID# 238-39, 242). The defense expert report indicates that clauses in the Development Agreement that limit certain industrial activities "reflect typical concerns of communities regarding the potential impacts of activities conducted outside of buildings including but not limited to potential impacts of noise, air and water pollution, visual impacts, and the creation of other nuisances." (R. 44-3, PageID# 1183). A mere "difference of opinion among parties is not sufficient to defeat" a defendant's environmental impact concerns when making a zoning decision. *Ziss Bros.*, 439 Fed. App'x at 478.

[6] Unlike the statements in Plaintiff's affidavits that lack foundation establishing personal knowledge, Kalman's affidavit states that his information is based upon personal knowledge stemming from his position as Walton Hills' Building and Zoning Inspector, "as well as zoning/property maps and other public documents." (R. 44-5, PageID# 1210; Exh. E at ¶5).

represent an existing legal nonconforming property." *Id*. at ¶10. Kalman's affidavit states that the Carr Brothers' concrete plant is indeed located in Walton Hills, but is "located in the I-2 zoned industrial district, has been located and operating as a concrete plant since 1954, does not include a public waterway; and has been an existing legal non-conforming use." *Id*. at ¶11.

Plaintiff must show that the "other individuals who were treated differently were similarly situated in *all material respects*." *Taylor Acquisitions, L.L.C. v. City of Taylor*, 313 Fed. App'x 826, 836 (6th Cir. 2009) (emphasis added); *see also TriHealth, Inc. v. Board of Comm'rs, Hamilton County, Ohio*, 430 F.3d 783 (6th Cir. 2005) ("Materiality is an integral element of the rational basis inquiry…. [D]isparate treatment of persons is reasonably justified if they are dissimilar in some material respect."); *Superior Commc'ns v. City of Riverview, Michigan*, 881 F.3d 432, 446 (6th Cir. 2018) (finding plaintiff's claim that it was similarly situated to other wireless operators failed because plaintiff failed to present "the terms of AT&T's or T-Mobile's licensing agreements in evidence" and therefore the court did not know whether they were subject to similar provisions as plaintiff).

Plaintiff has failed to meet its burden that the other two companies are similarly situated businesses in all material aspects. First, Ioppolo does not operate its concrete plant in Walton Hills, but rather only stockpiles materials on its property in Walton Hills, which further has a different zoning classification than Plaintiff's parcel. Conversely, Carr Brothers does not contain a public waterway. Both properties have been in operation for some time, the latter since 1954. Moreover, the Court finds that a potential change in Walton Hills' priorities, especially with respect to environmental concerns, over such a long passage of time renders Ioppolo and Carr poor comparators. A recent decision from another court in this Circuit has pointed as follows:

"[T]iming and context" are especially relevant to the similarly-situated inquiry,

especially in the zoning context. *See Taylor Acquisitions, L.L.C. v. City of Taylor,* 313 F. App'x 826, 836 (6th Cir. 2009) (citing *Cordi–Allen v. Conlon,* 494 F.3d 245, 253 (1st Cir. 2007) ). The *Taylor* Court quoted the following passage from *Conlon*:

> In the land-use context, timing is critical and, thus, can supply an important basis for differential treatment....[C]ourts must be sensitive to the possibility that differential treatment—especially differential treatment following a time lag—may indicate a change in policy rather than an intent to discriminate. Consequently, the most reliable comparisons are likely to be from roughly the same time frame.

*Id.* at 836-37 (quoting *Conlon,* 494 F.3d at 253).

In *Taylor*, the Sixth Circuit questioned whether the plaintiff had shown that it was treated differently from similarly situated developers: "[E]ven if Plaintiff is correct that it was treated differently than developers had been treated in the past, the election of a new mayor and a new City Council—with new priorities—belies any assertion that Plaintiff and the prior developers were similarly situated." *Id.* at 837.

*Tuscola Wind III, LLC v. Almer Charter Twp.,* 327 F. Supp. 3d 1028, 1047 (E.D. Mich. 2018) (concluding that Tuscola provided "no information" regarding the other allegedly similarly situated companies rendering it "unclear" whether Tuscola satisfied its burden of demonstrating that it was treated differently than similarly situated applicants).

Plaintiff has failed to provide the Court with sufficient information that would allow it to conclude that Ioppolo and Carr Brothers are similarly situated in all material respects. As stated above, the most reliable comparators would come from the same time frame, as different treatment may reflect changes in policy, such as prioritizing environmental concerns, rather than an intent to discriminate. For the aforementioned reasons, Plaintiff's "class-of-one" equal protection claim fails as a matter of law.

Plaintiff also suggests "no other similar business" was required to enter into a development agreement, but fails to cites evidence in support beyond the belief of its architectural consultant,

Henning, that "no other entity has to have a development agreement." (R. 41, PageID# 924, citing R. 37, Henning Depo. at 69).[7] Even assuming arguendo that this assertion is correct, Plaintiff's argument still fails, as Plaintiff cites no authority suggesting a village may not seek such an agreement to protect its citizens from noise nuisances or environmental concerns. Again, as the Sixth Circuit stated in *Taylor*, an entity can shift its priorities from the past. The first property owner or business to encounter a request for a development agreement has not necessarily been discriminated against.

Finally, even if the Court were to find disparate treatment occurred as compared to materially similar businesses, Plaintiff cannot satisfy the second element, as Plaintiff has not even attempted to argue that the government action lacked a rational basis. Plaintiff has further failed to present evidence that Defendants' actions were motivated by animus or ill-will. Plaintiff attempts to rely upon statements in a transcript that Ennis personally transcribed, which, as the Court stated above, is inadmissible. Nevertheless, even if the Court were to consider alleged statements in Ennis's aforementioned transcription, the statements therein fail to establish the requisite animosity or ill-will.

The transcript provided by Ennis indicates a resident was complaining about Plaintiff's operations, stating Plaintiff was in breach of contract by operating on a Sunday on at least two

---

[7] Even if the Court were to accept Henning's statement as creating an issue of fact regarding whether Plaintiff was the only business to enter into a Development Agreement, that alleged fact fails to establish there was no rational basis for Defendants to do so. Given a political subdivision's natural and rational concern for the environment or goal of avoiding nuisance to nearby residential properties, Walton Hills' decision to enter into a Development Agreement with a new business is not constitutionally offensive simply because it may not have been done before. Plaintiff identifies no local ordinance expressly prohibiting such agreements. Further, there is no genuine issue of material fact that Plaintiff entered into the agreement freely with the advice of counsel. In addition, the agreement was only signed *after* Plaintiff's submitted plans were unanimously approved.

15

occasions. (R. 41-1, PageID# 980-81). The same resident also complained about an "open burn" and dumping on the property. *Id*. The resident believed Plaintiff exhibited a pattern of behavior that breached its contract with Walton Hills and appeared to be seeking answers from the village council. (R. 41-1, PageID# 981-82). In this context, Mayor Kolograf ostensibly responded by saying Plaintiff had started work on its plant before it was even approved, and noted that Plaintiff was not an owner that they really wanted in the village, but acknowledged that Walton Hills cannot prevent an owner from buying a parcel of property and developing it for use if its meets zoning and other requirements. (R. 41-1, PageID# 982). Another speaker, possibly the Mayor, later explained that the village would be inviting a lawsuit if it attempted to stop a company from developing a property that submitted plans that met all the criteria for a parcel's zoning. (R. 41-1, PageID# 989). One speaker that is only identified as "Chad" makes a statement that indicates the EPA had already been out to the property before the October 2019 meeting, but had not made a "final decision." (R. 41-1, PageID# 983). Several other unidentified speakers join the conversation complaining about Plaintiff's activities. (R. 41-1, PageID# 984-989). After all of the aforementioned, a speaker who is unidentified in the transcript but who Plaintiff believes is Defendant Kalman, states that Ennis is a "pain in the *ss," and complains that he has had to work on weekends to address issues that have arisen from Plaintiff's business operations. (R. 41-1, PageID# 992).

The statements, when read in the appropriate context, do not demonstrate ill-will or animus. Rather, they portray village officials responding to numerous citizen complaints about Plaintiff and essentially show that they too are frustrated with an owner who, from their point-of-view, has frequently violated the terms of the Development Agreement and engaged in illegal dumping necessitating visits from the EPA. Furthermore, these statements from October of 2019 stem

from events that occurred *after* Plaintiff began operating the concrete plant. The Court finds they fail to show ill-will or animus as it relates to Defendants' decisions related to the Property in 2018 or early 2019 prior to Plaintiff beginning operations.[8] It is Plaintiff's theory that it was treated differently during the planning process in 2018, during the 2018 negotiations surrounding the Development Agreement, and that the recording of easements were delayed during early 2019. The most a reasonable juror could glean from Ennis's transcription of the council meeting is that Defendants developed an antipathy towards Plaintiff due to the manner in which Plaintiff operate its concrete plant. This is insufficient to show Defendant's actions predating Plaintiff's operation of its plant were motivated by animus or ill-will.

**B. Count Two: Inverse Condemnation**

Plaintiff contends Defendants have denied it the economically beneficial use of its property, and, therefore, a *de facto* taking has resulted. (R. 24, PageID# 160-61).

> As an initial matter, we note that the Fifth Amendment, and not substantive due process, is the basis upon which a plaintiff may challenge the government's actions with respect to his property: "*Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), precludes the use of substantive due process analysis when a more specific constitutional provision governs." *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, ——, 123 S.Ct. 1389, 1397, 155 L.Ed.2d 349 (2003) (Scalia, J., concurring) (internal quotations omitted). Moreover, to the extent that the plaintiffs attempt to avoid the dictates of *Graham* by claiming that their challenge is not to the "quasi-taking" of their property but is instead to the conduct of Whitehall officials—namely, the rigorous and allegedly selective enforcement of city regulations with the purpose of shutting down businesses suspected of contributing to a culture of crime—that

---

[8] The Court finds Plaintiff's reliance on *Paterek v. Village of Armada, Michigan*, 801 F.3d 630 (6th Cir. 2015) misplaced. Therein, a village official explained that he treated the plaintiff, a business owner, differently than another similarly situated business owner because: "he was 'not really the best of friends' with Paterek; he had a 'personality conflict' with Paterek; Paterek's 'views [were] different' than his own, and that Paterek should be held to a higher standard because he was the Supervisor of Armada Township, a position that allegedly included code enforcement responsibilities." *Id*. at 638. Plaintiff has not cited similar evidence herein to show that Defendants' planning decisions were motivated by such animus or ill-will.

> challenge is wholly without foundation. There exists no "fundamental" right in
> our legal system to violate a municipality's codes and regulations with impunity,
> and the conduct of Whitehall officials in enforcing those codes and regulations
> was neither "arbitrary" nor "conscience-shocking" in the constitutional sense.

*Banks v. City of Whitehall*, 344 F.3d 550, 554–55 (6th Cir. 2003)

The Supreme Court has recognized "two discrete categories of regulatory action as

compensable without case-specific inquiry into the public interest advanced in support of the

restraint." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992). The first is where the

property owner suffers a physical "invasion" of his property from the government. *Id*. The

second, and seemingly the theory advanced here by Plaintiff, is where a "where regulation denies

all economically beneficial or productive use of land." *Id*. Plaintiff's brief argues it was

"deprived of all economic use and value of its land for many months." (R. 41, PageID# 957).

First, Plaintiff commenced use of the Property and operated its concrete plant there

beginning in June of 2019. There is no indication that operation of the plant has ceased at any

point during this lawsuit. As such, any assertion that Plaintiff was denied any economically

beneficial use of the Property is untenable. (R. 41). To the extent Plaintiff asserts its property

was taken for "many months" while its Property was in the planning phase, Plaintiff has failed to

point to evidence establishing that it had submitted plans to the Planning Commission that

satisfied all of Walton Hills' building and zoning requirements, but that approval was arbitrarily

withheld. At this point in the litigation bald assertions that Defendants were responsible for

delay, without more, are insufficient.

To the extent Plaintiff's actual dispute revolves around the issue of whether the property

should be rezoned from I-1 to the heavier I-2 level of industrial use, it is questionable whether

such a claim is actionable as "Property interests are not created by the Constitution, they are

created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . ." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538  (1985) (internal quotation marks omitted); *accord Thomas v. Cohen*, 304 F.3d 563, 576 (6th Cir. 2002). "[I]n order to establish a property right in a future, rezoned land use, an individual 'must point to some policy, law, or mutually explicit understanding that both confers the benefit[] and limits the discretion of the City to rescind the benefit.'" *Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 573 (6th Cir. 2008) (*citing R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 435 (6th Cir. 2005)).

Finally, Plaintiff cannot show a Fifth Amendment taking occurred. In *Davet v. City of Cleveland*, 456 F.3d 549, 553 (6th Cir. 2006), the Sixth Circuit explained that a land-use regulation does not effect a taking if it substantially advances legitimate state interests, and that the Takings Clause does not require compensation to landowner owner who's barred from putting land to a use that is proscribed by *existing* rules or understandings. The *Davet* court further explained that the constitutional right of the individual to use private property has always been subservient to the public welfare and subject to the legitimate exercise of local police power. "[N]o individual has a right to use his [or her] property so as to create a nuisance or otherwise harm others, the State has not 'taken' anything when it asserts its power to enjoin the nuisance-like activity." *Grater v. Damascus Twp. Trs.*, No. 3:22 CV 318, 2022 WL 2717021, at *6 (N.D. Ohio July 13, 2022) (quoting *Keystone Bituminous Coal*, 480 U.S. at 491 n. 20 (1987).[9]

Plaintiff's complaint seeks compensation stemming from the legitimate exercise of Walton

---

[9] The decision should not be construed as an affirmative finding that Plaintiff's operation of its concrete plant did in fact result in a nuisance. Rather, the Court finds that the police power permitted Walton Hills to engage in actions, such as passing ordinances, that reasonably aimed to prevent a nuisance.

Hills' police powers. Therefore, Defendants are entitled to summary judgment on Count Two.

**C. Count Three: Denial of Procedural and/or Substantive Due Process**

The Due Process Clause of the Fourteenth Amendment states that "no ... State ... shall deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Sixth Circuit has interpreted the Due Process Clause to protect both procedural and substantive due process rights. *See, e.g., Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 572-74 (6th Cir. 2008); *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 296-97 (6th Cir. 2006); *Warren v. City of Athens, Ohio*, 411 F.3d 697, 705–10 (6th Cir. 2005); *Wojcik v. City of Romulus*, 257 F.3d 600, 609-11 (6th Cir. 2001).

> Procedural and substantive due process claims are examined under a two-part analysis. First, the Court must determine whether the interest at stake is a protected liberty or property interest under the Fourteenth Amendment. *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Only after identifying such a right do we continue to consider whether the deprivation of that interest contravened the notions of due process. *Board of Regents v. Roth*, 408 U.S. 564, 570–71, 92 S.Ct. 2701, 33 L.Ed.2d 548; *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989); *Ferencz v. Hairston*, 119 F.3d 1244, 1247 (6th Cir. 1997); *Tony L. v. Childers*, 71 F.3d 1182 (6th Cir. 1995). Even though individuals often claim property interests under various provisions of the Constitution, such interests are not created by the Constitution; nor may individuals manufacture a property interest. Unilateral expectations of a property interest are insufficient to trigger due process concerns. Instead, property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Parratt v. Taylor*, 451 U.S. 527, 529 n. 1, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) (quoting *Roth*, 408 U.S. at 577, 92 S.Ct. 2701); *see also Verba v. Ohio Casualty Insurance Co.*, 851 F.2d 811, 813 (6th Cir. 1988). Inasmuch as Plaintiffs have not shown that they enjoyed a protected interest in the transfer of the entertainment permit under Michigan law, we need not determine whether they were afforded due process.

*Wojcik v. City of Romulus*, 257 F.3d 600, 609 (6th Cir. 2001).

It is not entirely clear from the Amended Complaint or the briefs the exact protected

property interest Plaintiff claims has been violated. Construing the facts in the light most favorable to Plaintiff, it is clear that Plaintiff was permitted to operate a concrete manufacturing business after it submitted a plan that was approved by the Walton Hills' planning commission. To the extent Plaintiff believes it was entitled to have the Property re-zoned, to operate the plant without complying with a freely entered Development Agreement,[10] or without complying with local, state, or environmental regulations, Plaintiff cites no authority holding such a property interest exists.

It is true that the Sixth Circuit has recognized that "citizens have a substantive due process right not to be subjected to arbitrary or irrational zoning decisions." *Richardson v. Twp. of Brady*, 218 F.3d 508, 512 (6th Cir. 2000) (*quoting Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1217 (6th Cir. 1992)). "A zoning ordinance may be challenged as violative of substantive due process either on its face or as applied to a particular parcel of land." *Id*. "When a landowner makes a facial challenge to a zoning ordinance, 'he or she argues that any application of the ordinance is unconstitutional.'" *Id*. (*citing WMX Techs., Inc. v. Gasconade County*, 105 F.3d 1195, 1198–99 n. 1 (8th Cir. 1997)). Conversely, when a plaintiff makes an "as applied" challenge, it is "attacking only the decision that applied the ordinance to his or her property, not the ordinance in general." *Id*. (citations omitted).

Plaintiff's opposition brief does not specify which type of challenge it is raising. The Court construes Plaintiff as raising the latter "as applied" challenge, as Plaintiff appears to take issue

---

[10] Plaintiff's assertion that it entered the Development Agreement under duress or was forced into entering into the agreement is belied by the fact that Ennis's deposition testimony unequivocally stated that Plaintiff was "not opposed to" entering into such an agreement when the subject was first brought up. (R. 36, Ennis Depo. at 78). Furthermore, Plaintiff's counsel drafted the initial version of the agreement, and Plaintiff's counsel negotiated its final terms. (R. 36, Ennis Depo. at 78; R. 37, Henning Depo. at 63, Exh, B).

with the manner in which Defendants applied Walton Hills Ordinances § 1285.05(d)(4)(C) & (f).

Ordinance § 1258.05(d)(4) states as follows:

> (4) *Action by the Planning Commission*. The Planning Commission shall review the development plan according to the applicable criteria in Section 1258.05 (f). Following its review, the Planning Commission shall:
>
> A. Approve the development plan as submitted; or
>
> B. Approve the plan subject to specific conditions not included in the plan as submitted, such as, but not limited to, improvements in the setback layout, open space arrangement, on-site control of access to streets, or such features as fences, walls and plantings to further protect and improve the proposed and surrounding developments; or
>
> C. Deny the development plan. If the Planning Commission finds that a proposed plan does not meet the purposes of these regulations, it shall deny the plan and shall submit its findings in writing to the applicant upon the applicant's request; or,
>
> D. Postpone the development plan for the next scheduled Planning Commission meeting, demonstrating to the applicant an acceptable alternative plan.

(R. 34-6, PageID# 430: Exh. E).

Plaintiff argues that Walton Hills, under its own ordinance, was required to "either approve in some way or present an alternative at the next meeting," but did neither and thereby violated Plaintiff's due process rights. (R. 41-1, PageID# 954). First, Plaintiff's argument inaccurately summarizes the language of the ordinance. Second, it fails to cite any evidence of record that Defendants failed to take any of the permitted actions in parts A, B, C, or D. In fact, Plaintiff does not even identify which set of submitted plans were ostensibly rejected. Further, assuming an earlier set of plans were rejected prior to the Planning Commission's unanimous approval in December of 2018, Plaintiff has made no attempt to demonstrate that a set of rejected plans

actually satisfied all the criteria of § 1258.05(f) but was, nevertheless, rejected.[11] In addition, the ordinance only requires the Planning Commission to submit its findings in writing to the applicant *upon* the applicant's request. Plaintiff points to no evidence in the record that it ever made a request for a written copy of a denial if one indeed occurred. Finally, Plaintiff's assertion— that no provision of any ordinance requires a property owner to enter into a development agreement—does not show that such agreements are prohibited.

**D. Count Four: § 1983**

Defendants assert that Plaintiff's *Monell* claims against the Village fail as a matter of law. First, Defendants assert they are entitled to summary judgment because there was no constitutional violation, the *Monell* claims cannot be sustained. (R. 34-1, PageID# 245-46).[12] Defendants are correct that a municipality cannot be held liable under § 1983 for an employee's conduct that inflicts no constitutional injury. *Peet v. Detroit*, 502 F.3d 557, 566 (6th Cir. 2007). As found in the above discussed federal causes of action, Plaintiff has failed to offer sufficient evidence capable of creating a genuine issue of material fact. In other words, Plaintiff has not presented evidence capable of establishing a constitutional violation. Therefore, Plaintiff's § 1983

---

[11] A court cannot transform a party's undeveloped or underdeveloped "argument" into a substantive argument without improperly becoming an advocate. It is well established that "issues which are 'adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" *See, e.g., Kennedy v. Comm'r of Soc. Sec.*, 87 Fed. App'x 464, 2003 WL 23140056, at *1 (6th Cir. 2003) (citing *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996)) (rejecting perfunctory argument). "It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-996 (6th Cir. 1997).

[12] Under *Monell*, a "municipality may not be held liable under § 1983 on a respondeat superior theory—in other words, solely because it employs a tortfeasor…. Instead, a municipality is liable under § 1983 only where, through its deliberate conduct, it was the moving force behind the injury alleged." *D'Ambrosio v. Marino*, 747 F.3d 378, 388–89 (6th Cir. 2014) )(internal quotation marks omitted) (citing *Monell v. Dep't of Soc. Serv.*, 426 U.S. 658 (1978) and *Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013)).

claim must also fail.[13]

Plaintiff cites *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 405 (1997) for the proposition that "proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably." (R. 41, PageID# 960-61). Plaintiff's brief, however, is entirely conclusory and points to no set of facts that would allow a juror to conclude that any of the Defendants intentionally deprived Plaintiff of a federally protected right. *Id*. Further, Plaintiff has not identified any policy, practice, custom or a failure to train, supervise, or discipline an employee that could result in *Monell* liability. As discovery has concluded, Plaintiff may no longer rely on threadbare allegations to avoid summary judgment.

Therefore, Defendants are entitled to summary judgment on Count Four.

**E. Counts Six, Seven, and Nine: Taxpayer Actions**

Under Count Six, Plaintiff seeks injunctive relief pursuant to O.R.C. § 733.56. (R. 24, PageID# 165). In Count Seven, Plaintiff "desires an immediate declaration of its rights arising out of all the facts and circumstances …." *Id*. at 167.[14] Under Count Nine, Plaintiff seeks to

---

[13]  Because Plaintiff has failed to identify a constitutional violation *and* failed to identify evidence capable of supporting a violation, claims against the individually named Defendants also fail. Defendants have argued that Kolograf and Kalman are also entitled to qualified immunity. (R. 34-1, PageID# 243-45).  The Court finds this issue has been rendered moot. Nevertheless, Plaintiff's vague and conclusory response that these defendants "knew or should have known" that their actions would violate Plaintiff's constitutional rights by acting with ill-will has been rejected elsewhere in this decision.

[14] Defendant's motion for summary judgment construes Count Seven as attempting to raise an inactionable state law taxpayer action. (R. 34-1, PageID# 229, 230). Plaintiff's Opposition brief, while arguing that it is a taxpayer with proper standing, has not specifically opposed summary judgment on this claim. (R. 41). As the Court has determined all of Plaintiff's claims fail as a matter of law, Count Seven fails for the same reasons. Furthermore, Count Seven's request for declaratory relief based on the facts alleged is more akin to a prayer for relief rather than a free-standing claim.

maintain a mandamus action pursuant to O.R.C. § 733.58. (R. 24, PageID# 167-68). Defendants assert Plaintiff lacks standing to bring a state taxpayer action under either Count. (R. 34-1, PageID# 246-249). Plaintiff's brief acknowledges that its actions in Counts Six and Nine can only be maintained if such an action   is of great importance and interest to the public. (R. 41, PageID# 964, citing *State ex rel. Teamsters Local Union 436 v. Cuyahoga Cty. Bd. of Commrs.*, 132 Ohio St.3d 47, 969 N.E.2d 224, ¶ 12 (Ohio 2012)).

The same decision relied upon by Plaintiff also states that "when a remedy being pursued is one that is merely for the individual taxpayer's benefit, the taxpayer cannot claim that he is vindicating a public right, and he will not have standing to pursue a taxpayer action." *Id*. Plaintiff relies on *State ex rel. Cater v. N. Olmsted*, 69 Ohio St. 3d 315, 323, 631 N.E.2d 1048, 1055 (Ohio 1994) for the proposition that a taxpayer action may lie where a plaintiff seeks to enforce the public's right to proper execution of its charter removal provisions. (R. 41, PageID# 964-65). Plaintiff believes the present action is similar, and the mandamus action should be allowed to proceed as determined in *State ex rel. Cater* (hereafter "*Cater*"). The Court finds that *Cater* is distinguishable.

In *Cater*, the plaintiff, James Cater, sought to maintain a taxpayer action that would benefit his friend, Thomas Stroh, who had been a municipality's Civil Service Commission Chairman. 631 N.E.2d at  1049-51. Stroh was removed from office after failing to provide a complete list of exams scores of police officer candidates to the mayor and police chief. *Id*. Before the Supreme Court's decision, the state appellate court had determined that there was cause for Stroh's removal, as the exam scores were public records under both O.R.C. § 149.43 and the municipality's charter. *Id*. at 1051-52. Nevertheless, the state appellate court had found that Stroh had not been removed in accordance with charter procedures, as only elected council

members could vote on Stroh's suspension, and a number of unelected individuals had voted for Stroh's removal. *Id*. at 1049-51. The Ohio Supreme Court found that while Cater may have been motivated by a desire to see his friend reinstated rather than "purely philanthropic motives," "the public's right to the services of a public official who is purportedly performing in accordance with charter provisions" was a "sufficient basis upon which to institute a taxpayer action" rendering taxpayer standing. *Id*. at 1055.[15] Unlike in *Cater* where the state appellate court had made an affirmative determination that the municipality's removal of Stroh was procedurally improper—Plaintiff herein has only offered conclusory assertions that village ordinances were not followed.  (*see* Part IV-C, *supra*).

Rather, this case is more analogous to *Home Builders Assn. of Dayton & the Miami Valley et al., v. Lebanon*, 167 Ohio App.3d 247,250, 854 N.E.2d 1097, 1100 (Ohio Ct. App. 2006), where multiple home-building companies challenged an ordinance requiring that all newly constructed units be connected to the municipality's broadband telecommunications system. The state appellate court determined plaintiffs had no standing to maintain a taxpayer action explaining as follows:

> Having reviewed the relevant case law regarding taxpayer actions, we conclude that the homebuilders did not have standing to bring a taxpayer action. The rights sought to be enforced by the homebuilders were essentially private in nature and were not comparable to the rights sought to be enforced in *Nimon*, *White*, *Cater*, and *Sheward*. As the homebuilders argue, there was some general benefit to the public in preventing the city from enforcing an unconstitutional ordinance. However, the interests pursued by the homebuilders were primarily related to a narrow class of citizen/taxpayers who were required to pay the telecommunications fee: those engaging in new construction within the city. As

---

[15] The *Cater* decision also noted that "when no other adequate remedy exists, '[m]andamus is the proper remedy to restore a party to the possession of an office from which he has been illegally removed.'"  631 N.E.2d at 1054-55. Here, Plaintiff was not without any other adequate remedy, as it could file the present action asserting numerous causes of action in its own right rather than as a taxpayer.

the court stated in *Assn. of Cleveland Fire Fighters, Local 93*, "[t]he enforcement of private rights often confers a public benefit, but the ability to contemplate a public benefit does not translate every private action against a municipality into a taxpayer's suit." 156 Ohio App.3d 368, 2004-Ohio-994, 806 N.E.2d 170, at ¶17. *See, also*, *Brauer v. Cleveland* (1966), 7 Ohio St.2d 94, 96, 36 O.O.2d 80, 218 N.E.2d 599. (suit's aim was not to enforce public right where "sole purpose of the action was to prevent the municipality from requiring payment of fees by a limited class of property owners, of which plaintiff is a member").

*Home Builders Assn. of Dayton*, 854 N.E.2d at 1107-08.

In the case at bar, Plaintiff only meaningfully challenges the village's ordinances *as they were applied to plaintiff*. Thus, Plaintiff's assertion that it is seeking to enforce a public right is even more narrow than the plaintiffs in *Home Builders Assn. of Dayton*. Further, to the extent Plaintiff seeks approval of additional construction, such as a silo, or a rezoning to I-2, its argument that it is seeking to vindicate a public right becomes ever more specious.

The Court grants summary judgment on Counts Six and Nine as Plaintiff lacks standing to bring a taxpayer suit under Ohio law.

**F. State Law Claims: Counts Five, Eight, and Ten**

In Counts Five, Eight, and Ten, Plaintiff alleges gross negligence, conspiracy, and fraudulent inducement respectively.

### 1. Defendant Walton Hills

Defendant Walton Hills asserts it is immune to the aforementioned state law claims pursuant to O.R.C. § 2744.02(A)(1), which states that "a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." Plaintiff has not challenged the assertion that Defendant Walton Hills constitutes a political subdivision under the statute.

A "governmental function" is defined by statute as: (1) "a function that is imposed upon the state as an obligation of sovereignty and that is performed by a political subdivision voluntarily or pursuant to legislative requirement;" (2) "a function that is for the common good of all citizens of the state;" *or* (3) "a function that promotes or preserves the public peace, health, safety, or welfare" that involves activities "not customarily engaged in by nongovernmental persons" and not specified in other parts of the statute. O.R.C. § 2744.01(C)(1). In addition, "government functions" also includes the provision of police, fire, and other emergency services; "the regulation of the use of, and the maintenance and repair of, roads, highways, streets, avenues, alleys, sidewalks, bridges, aqueducts, viaducts, and public grounds;" judicial, quasi-judicial, prosecutorial, legislative, and quasi-legislative functions; and "[t]he provision or nonprovision of inspection services of all types, including, but not limited to, inspections in connection with building, zoning, sanitation, fire, plumbing, and electrical codes, and the taking of actions in connection with those types of codes, including, but not limited to, the approval of plans for the construction of buildings or structures and the issuance or revocation of building permits or stop work orders in connection with buildings or structures." O.R.C. § 2744.01(C)(2). Based upon the plain language of the statute, the Court finds that the allegations regarding Defendant Walton Hills' acts or omissions unambiguously relate to a "governmental function." *See also State ex rel. Scadden*, 2002-Ohio-1352, 2002 WL 452472 (Ohio Ct. App. Mar. 2002) ("Enforcement of zoning laws is in the nature of a governmental function."); *Helfrich v. City of Pataskala*, 2003-Ohio-847, ¶ 25 2003 WL 490930 (Ohio Ct. App. Feb. 2003) (finding "the City of Pataskala is a political subdivision. Pataskala's zoning department is an instrumentality carrying out the functions of the City of Pataskala. Both the City of Pataskala and its Zoning Commission are entitled to the immunity from tort liability provided to political subdivisions in

R.C. Chapter 2744."); *cf. Wilson v. Stark Cty. Dep't of Hum. Serv.*, 1994-Ohio-394, 639 N.E.2d 105, 108 (Ohio 1994) ("Where a county is immune under R.C. 2744.02 in its operation of a human services department, that immunity extends to the human resources department itself.")

The statute does provide for a number of exceptions to the immunity provision of O.R.C. § 2744.02(A)(1). However, none of the exceptions apply here.[16] O.R.C. § 2744.02(B). Plaintiff's brief in opposition fails to make a good faith argument that Walton Hills does not enjoy statutory immunity. Rather, Plaintiff merely lists a number of inapposite cases, without explanation, in an attempt to make a fragment of a public policy argument. (R. 41, PageID# 961).[17] Therefore, Walton Hills, as well as its Planning Commission, is entitled to summary judgment with respect to Counts Five, Eight, and Ten.

### 2. Individually Named Defendants — Mayor Kalman and Building Inspector Kalman

Defendants assert that the individually named Defendants, Mayor Kolograf and Building

---

[16] The exceptions to immunity include injury stemming from the negligent operation of a motor vehicle by an employee, injury caused by the negligent performance of *proprietary* functions, injury caused by the negligent failure to keep public roads and negligent failure to remove obstructions from such roads, injury caused by defects with respect to public grounds and buildings, and other circumstances where civil liability is expressly imposed upon a political subdivision by another section of the Revised Code. O.R.C. § 2744.02(B).

[17] The Supreme Court's decision in *Wyatt v. Cole*, 504 U.S. 158 (1992) involved a federal § 1983 action and did not address whether statutes could confer immunity on political subdivisions with respect to state law claims. *See also Hitachi Med. Sys. Am., Inc. v. Philbrick*, 2011 WL 841183, at *2 (N.D. Ohio Mar. 7, 2011) (addressing the constitutionality of the rules of service in the context of a motion to set aside default judgment); *Stickovich v. Cleveland*, 2001-Ohio-4117, 143 Ohio App. 3d 13, 24, 757 N.E.2d 50, 59 (Ohio Ct. App 2001) (finding "no public policy against political subdivisions obtaining liability insurance coverage" and indicating that O.R.C. § 2744.08(A)(1) specifically allows for it); *Khoury v. Trumbull Physician Hosp. Org.*, No. 99-T-0138, 2000 WL 1804356, at *4 (Ohio Ct. App. Dec. 8, 2000) (involved an argument that a contract—not a statute—was against public policy); *Jacobs v. Teledyne, Inc.*, 529 N.E.2d 1255, 1259 (Ohio 1988) (not involving O.R.C. § 2744 but rather the application of the judicial doctrine of res judicata where its application would override public policy or result in a manifest injustice).

and Zoning Inspector Kalman, are also entitled to immunity under the statute as political subdivision employees. (R. 34-1, PageID# 252-54).

"In a civil action brought against a political subdivision or an employee of a political subdivision to recover damages for injury, death, or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function, the following defenses or immunities may be asserted to establish nonliability … [t]he political subdivision is immune from liability if the action or failure to act by the employee involved that gave rise to the claim of liability was within the discretion of the employee with respect to policy-making, planning, or enforcement powers by virtue of the duties and responsibilities of the office or position of the employee." O.R.C. § 2744.03(A)(3). Political subdivision employees are similarly immune unless an exception applies. O.R.C. § 2744.03(A)(6).

Plaintiff does not challenge that Defendants Kolograf and Kalman are political subdivision employees who may be immune to civil suit related to their duties, but does allege that an exception applies. (R. 41, PageID# 962-63). Specifically, Plaintiff alleges Kolograf and Kalman's "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner" under O.R.C. § 2744.03(A)(6)(b). (R. 41, PageID# 962).

In support of its argument, Plaintiff points to the same statements taken from a council meeting transcript that the Court previously addressed in connection with Plaintiff's equal protection argument in Part IV-A above. *Id*. at PageID# 963. Ennis's transcription of the council meeting is inadmissible, as explained in the aforementioned section. Nevertheless, even were the Court to consider the statements, they fail to establish the requisite malicious purpose, bad faith, or evidence that these Defendants exercised their duties in a wanton or reckless manner. In the interests of judicial economy, the Court will not repeat its rationale and points the reader to its

analysis in Part IV-A.

The Court finds, Defendants Kolograf and Kalman are also immune. Therefore, all Defendants are entitled to summary judgment on the state law claims in Counts Five, Eight, and Ten.

**G. Walton Hills' Planning Commission**

The Amended Complaint names the Village of Walton Hills' Planning Commission as a Defendant in this matter. (R. 24, PageID# 154). Defendants contend that the village's Planning Commission is not an entity capable of being sued, and, therefore, it must be dismissed with prejudice.  (R. 34-1, PageID# 236-37).

It is well established in Ohio that "both plaintiff and defendant in a lawsuit must be legal entities with the capacity to be sued." *Patterson v. V & M Auto Body*, 63 Ohio St. 3d 573, 574, 589 N.E.2d 1306, 1308 (1992); *see also Lindow v. N. Royalton*, 661 N.E.2d 253, 258 (Ohio Ct. App. 1995) (finding a municipality's fire department was not a separate entity, and the real party in interest is the municipality itself); *State ex rel. Duncan v. Vill. of Middlefield*, 2008-Ohio-1891, ¶18 (Ohio Ct. App. 2008) (finding a village council and the village's planning and zoning commission were not entities "which could not be sued separately under Ohio law"), *aff'd by* 120 Ohio St. 3d 313, 898 N.E.2d 952 (Ohio 2008).

Plaintiff's brief in opposition identifies no authority suggesting a municipality or village's planning commission is capable of being sued. The only case cited by Plaintiff  actually supports Defendant's argument in so far as it observes that  "[a] city council is not sui juris and therefore cannot sue or be sued in its own right, absent statutory authority." *Mollette v. Portsmouth City Council*, 863 N.E.2d 1092, 1097 (Ohio Ct. App. 2006) (quoting *City of Cuyahoga Falls v. Robart*, 567 N.E.2d 987, 992 (Ohio 1991). Instead such a lawsuit should be brought against the

city itself. *Id.* at 1097.

Therefore, the Planning Commission is dismissed from this action. Moreover, any claims against it fail for the same reasons as claims fail against the village itself as explained elsewhere in the body of this decision.

## V. Conclusion

For the foregoing reasons, the Defendants' Motion for Summary Judgment (R. 34) is hereby GRANTED.

IT IS SO ORDERED.

s/ *David A. Ruiz*

David A. Ruiz
United States District Judge

Date: January 31, 2023